### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

Lucas B. Stone, et al.,    :
    **Plaintiffs,**    :
                     :
                     :
**v.**    :
                     :    **Case No. 3:04cv18 (JBA)**
Town of Westport, et al.,:
    **Defendants.**    :

### Ruling on Defendants' Motion for Partial Summary Judgment
### [Doc. # 36]

Plaintiffs Lucas B. Stone and his mother Joan Lorraine Zygmunt brought this civil action for damages pursuant to 42 U.S.C. § 1983 against the Town of Westport and several of its police officers asserting claims of unreasonable entry, excessive force, false arrest/malicious prosecution, and denial of equal protection.  See Amended Complaint [Doc. # 17].  Plaintiffs have withdrawn their equal protection claims and their claim against Police Officer John Parisi.  Thus, the claims remaining in this action are: (1) Zygmunt's claim of unreasonable entry in violation of the Fourth Amendment against Officer David Simonetti (Count I); (2) Stone's claim of unreasonable force in violation of the Fourth Amendment against Officer Fotios Koskinas (Count II); and (3) Stone's claim of false arrest and malicious prosecution in violation of the Fourth Amendment against Officer John Cabral (Count III).  Defendants now move for summary judgment on Counts I and III only.  See Defendants' Motion for Summary Judgment [Doc. # 36].  For the reasons that follow,

1

defendants' motion is granted.

I.   **FACTUAL BACKGROUND**

The remaining claims stem from events related to the arrests of Stone on three occasions.  Count I concerns the entry of Officer Simonetti into Zygmunt's house after the arrest of her son Stone on February 25, 2001 for public disturbance and reckless driving.  Count II concerns alleged excessive force used in the arrest of Stone on August 10, 2001 after a traffic accident.  Count III concerns the arrest of plaintiff Stone by Officer Cabral on October 20, 2002 on a charge of criminal mischief.

A.   **Unreasonable Entry (Count I)**

On the evening of February 25, 2001, Stone was arrested by Simonetti following a disturbance at the CVS pharmacy in Westport Connecticut on charges of creating a public disturbance in violation of Conn. Gen. Stat. § 52a-181a and reckless driving in violation of Conn. Gen. Stat. § 14-222.  See Def's L.R. 56(a)(1) Stmt. [Doc. # 38], Ex. D at 12-13 (incident report).  After releasing Stone on a promise to appear around midnight, Officer Simonetti realized that because Stone was a minor, he was required to release Stone to a parent or guardian, which he had not done.  See Amgt. Def's L.R. 56(a)(1) Stmt. at ¶¶ 23-24.  To rectify this, at approximately 1:30 a.m. on February 26, 2001, Simonetti called Stone's mother, Zygmunt, waking her up, to

2

inform her that her son "had been arrested for a traffic charge . . . and that the officer had let him go, not realizing he was still 17 years old and underage, and hadn't called the parent to get him," that he needed to get some papers signed and had "to come over now." See Pl's L.R. 56(a)(2) Stmt. [Doc. # 47], Ex. 1 (Zygmunt Deposition) at 14-17; Def's L.R. 56(a)(1) Stmt., Ex. C (Simonetti Affidavit) at ¶¶ 17-19. Zygmunt testified that she told Simonetti she felt sick and "terrible,"[1] and as a result had to put the phone down for a time, but Simonetti "kept persisting." See Pl's L.R. 56(a)(2) Stmt. [Doc. # 47], Ex. 1 (Zygmunt Deposition) at 15-18, 74-75. Zygmunt testified that she was "totally confused" and did not know whether Simonetti had Stone with him or whether Simonetti would bring Stone home. Id. The parties dispute what Simonetti told Zygmunt over the phone about what Stone had been arrested for and the potential penalty. It is undisputed that in the course of the telephone call, Zygmunt told Simonetti that he could come over and when he arrived, she let him in. See id. at 17, 19-20, 25.

Simonetti's testimony is undisputed that his "sole reason for visiting Zygmunt was to have the documents signed," and not to conduct any search or investigation, seize any items, or make any arrests. See Def's L.R. 56(a)(1) Stmt., Ex. C (Simonetti

---

[1] Zygmunt apparently suffers from severe medical conditions including a heart ailment and lupus. See Pl's L.R. 56(a)(2) Stmt. Ex. 1 (Zygmunt deposition) at 18.

Affidavit) at ¶¶ 21, 26-30; Pl's L.R. 56(a)(1) Stmt. at ¶¶ 28-29.
The parties dispute what Simonetti said to Zygmunt in connection
with getting her to sign the documents that he brought and
whether he ignored Zygmunt's comments that she felt ill and dizzy
and could not read the documents, telling her that she did not
need to read them before signing them.  Zygmunt acknowledged that
"[Simonetti] wasn't twisting [her] arm," and did not physically
force her to sign the documents, but that "[she] knew [she] was
alone in [her] house with a man with a gun, and [she] knew [she]
[was] not supposed to resist."  See Pl's Local Rule 56(a)(2)
Stmt., Ex. 1 (Zygmunt Deposition) at 22-25, 28.  After Zygmunt
signed the papers, she paged her son and received a return a
telephone call from him and Simonetti left the house.  Id. at 25.
Zygmunt never read, or received any copy of, the documents she
signed that night.

## B.   False Arrest/Malicious Prosecution (Count III)

The second claim at issue in this motion relates to Stone's
arrest for criminal mischief on October 20, 2002.  At 2:20 a.m.
on October 20, 2002, Officer Cabral responded to a report of
vandalism.  On the scene and waiting for him outside the house of
Justin McCarthy were three friends – Luke Barta, James
Connaughton, and Justin McCarthy.  "Mr. Barta had said that, and
Mr. McCarthy and Mr. Connaughton said they knew Luke Stone had –
they just saw him jump on the back of [Barta's] car . . . and

4

break off the back bumper of the vehicle and they believe that he wrote HIV on the back window of the vehicle . . . [h]e wasn't driving a car . . . he ran up the hill . . . They said they saw him leave in possibly a dark vehicle."  See Pl's L.R. 56(a)(2) Stmt., Ex. E (Cabral deposition) at 32-33, 35-36.  Cabral also observed the damage complained of.  Id. at 47.  Stone testified that Justin McCarthy told him later that Barta reported to Cabral, with Connaughton concurring, that he had seen Stone rip the bumper off and run across the road and jump into his black Jeep, and Stone believes that Cabral helped Barta and Connaughton modify their story to "dark or black car" after Cabral determined upon inspection that Stone's black Jeep had not been driven in hours.[2]  See id., Ex. 2 (Stone deposition) at 81-82, 85-86, 88.  No testimony or affidavit of McCarthy comprises any part of the record.

While Barta, Connaughton, McCarthy, and Cabral were standing outside McCarthy's house, Stone drove by in his mother's white Subaru, with a friend, Lee Bates.  See id., Ex. 2 (Stone deposition) at 88-90; Ex. 3 (Cabral deposition) at 43.  Defendants claim that Barta and Connaughton said "that's him" and

---

[2]  According to Stone's deposition testimony, shortly after Officer Cabral arrived at the scene he visited Stone's house just around the corner from Justin McCarthy's, felt the hood of Stone's black Jeep, and stated that "it was stone cold" and had not been driven in hours.  See id. at 85-86.  Stone further testified that in fact the Jeep was incapable of being driven at the time due to engine difficulties.  Id.

it is undisputed that Cabral waved Stone over.  Cabral asked
Stone to show his hands, which Stone did (his hands were clean),
and then accused Stone of being sweaty and of breathing heavily.
Id., Ex. 2 (Stone deposition) at 88-90.  Stone denied that he was
sweating or breathing heavily, and that he had any involvement in
the vandalism, and claimed instead that he was returning home
from visiting a friend at Albertus Magnus college in New Haven.
Id.  Stone gave Officer Cabral a college parking timecard which
Stone claimed showed that he had been at the college, id., but
which Cabral claimed showed Stone on campus at 7 a.m. or 7 p.m.,
but did not account for his whereabouts after 2 a.m.  Pl's L.R.
56(a)(2) Stmt., Ex. C (Cabral deposition) at 45-46, 48-50.  The
parties dispute whether Cabral discarded the timecard or returned
it to Stone.  Cabral admitted that he never investigated Stone's
alibi in any way.  Id.

Officer Cabral took Stone, Barta, and Connaughton to the
police station, where Barta and Connaughton gave sworn written
statements.[3]  See Def's L.R. 56(a)(1) Stmt., Ex. G (written
statements of Barta and Connaughton).  These written statements

---

[3] It appears to be disputed whether Justin McCarthy and Lee
Bates also came to the police station, but it is undisputed that
neither gave a written statement.  Cabral testified that he did
not take McCarthy's written statement because he knew from
McCarthy's on scene statement that he "didn't see much," see Pl's
L.R. 56(a)(2) Stmt., Ex. C (Cabral deposition) at 32, 41-42, and
that he did not take Bates' statement, as passenger in Stone's
car, because he thought it would be biased.  See id. at 44-45.
Stone went to the police station voluntarily.  See id. at 38.

reiterated that Barta and Connaughton heard a car alarm, looked outside and saw Stone running away from Barta's car, observed a vehicle driving away from the top of the hill, and noticed the damage and writing on Barta's car.  See id.  After the statements were made, Officer Cabral arrested Stone for criminal mischief,[4] in violation of Conn. Gen. Stat. § 53a-116.[5] Defendants contend that Officer Cabral's conclusion that he had probable cause to arrest Stone was based on the two sworn witness statements, Stone's proximity to the McCarthy residence – and thus the vandalized vehicle – when he was stopped, his sweaty appearance and heavy breathing, and the observed damage to the vehicle.[6]

---

[4]  Defendants explain that Stone was arrested on "speedy information," pursuant to Conn. Gen. Stat. § 54-1f, which provides: "Peace officers . . . shall arrest, without previous complaint and warrant, any person for any offense in their jurisdiction, when the person is taken or apprehended in the act or on the speedy information of others . . . "  Conn. Gen. Stat. § 54-1f(1).

[5]  Stone pleaded not guilty and went to trial on the criminal mischief charge and was acquitted by the jury.  On the day following his arrest, Stone offered to pay Barta for the damage to his car if Barta would drop the charges, having found out who actually damaged the bumper and having worked out a liaison role for himself to pay Barta the money and be reimbursed by the real perpetrator who would thereby not be exposed to arrest.  Barta agreed and Stone paid him between $200 and $300. They subsequently discovered that only the court could drop the charges once the arrest had been made, and Barta returned Stone's money.  See Pl's L.R. 56(a)(2) Stmt., Ex. 2 (Stone deposition) at 90-92, 97; Def's L.R. 56(a)(1) Stmt., Ex. F (incident report) at 4.

[6]  Plaintiffs stress the significance of Officer Cabral's failure to include in his incident report the alleged witness statements concerning Stone's black Jeep or a dark car, and that

See Def's L.R. 56(a)(1) Stmt., Ex. F (incident report) at 10; Pl's L.R. 56(a)(2) Stmt., Ex. 3 (Cabral deposition) at 37-38, 43, 47-48.

## II.   STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of N. Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion."  Id. (citations

---

Stone was stopped driving a white car.  Defendants reference Cabral's explanation that the information was not included because neither the vehicle nor the driver of the getaway car had been identified and he did not have a license plate number for the car, and therefore any such allegations were not relevant. See Defs' Reply Memo. [Doc. # 49] at 7-8; Pl's L.R. 56(a)(2) Stmt., Ex. 3 (Cabral deposition) at 37, 108.

omitted).  "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied by pointing to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential

Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").  In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion.  Matsushita, 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient.  Matsushita, 475 U.S. at 586 (citations omitted).

## III. DISCUSSION

## A.    Claim of Unreasonable Entry (Count I)

Zygmunt's claim of unreasonable entry against Officer Simonetti alleges that Simonetti obtained her consent to enter her house in the early morning hours by misrepresentations and fraudulent statements while she was sick and confused and under circumstances showing unreasonable officer conduct,

10

"constitut[ing] an unreasonable entry into the plaintiff's home,"
and that Simonetti's actions "were intentional and were inspired
by malice."  Amended Complaint, Count I, at ¶¶ 5-8.  The false
pretenses under which plaintiff let Simonetti into her home were
that he "falsely [led] her to believe he [was] bringing her son
home," see Pl's Opposition Br. at 10, and told her that Stone was
arrested for a "light traffic charge" and would only have to pay
a fine.  See  Pl's L.R. 56(a)(2) Stmt, Ex. 1 (Zygmunt deposition)
at 27, 29.  Additionally, plaintiffs claim that once in the home,
Simonetti "coerced" or "forced" Zygmunt to sign the papers after
she informed him that she was ill, felt dizzy, and could not read
them.  See Amended Complaint, Count I at ¶ 5; Pl's L.R. 56(a)(2)
Stmt, Ex. 1 (Zygmunt deposition) at 27, 29 ("[Simonetti] acted
maliciously in that he gave me the – lied to me and then held
back information and then forced me to sign those papers that I
wasn't allowed to read and which were probably – I was probably
signing a false statement.").

Defendants point to Zygmunt's deposition testimony that she
invited Simonetti into her home and argue that her consent to his
entry negates any claim of a Fourth Amendment violation.  See
Defs' Moving Mem. [Doc. # 37] at 9.[7]  Plaintiffs respond that

---

[7] Defendants alternatively argue that this Fourth Amendment
claim is barred by the doctrine of qualified immunity because
Simonetti's conduct did not violate any "'clearly established
statutory or constitutional rights of which a reasonable person
would have known.'"  See id. at 10 (citing Harlow v. Fitzgerald,

Zygmunt did not voluntarily consent to Simonetti's entry into her home because Simonetti gained access under false pretenses and at a time when she was "disoriented, confused, and ill," and panicked about the arrest and the whereabouts of her son, and that Simonetti's actions were thus unreasonable and he is not entitled to qualified immunity.  See Pl's Opposition [Doc. # 46] at 9-10.  At oral argument, plaintiff expanded on the inferences to be drawn from the evidence that defendant arrived at 1:30 a.m., plaintiff was home alone, was sick and anxious about her son, and defendant's false urgency claimed to relate to plaintiff's son (to cover up his own carelessness), coupled with defendant's post-entry pressure on plaintiff to sign papers, as proving an unreasonable entry and thus a Fourth Amendment violation.

As all parties acknowledge, "[w]arrantless entry into a home is per se unreasonable . . . absent consent or exigent circumstances."[8]  See Waananen v. Barry, 343 F. Supp. 2d 161 (D. Conn. 2004) (citing Payton v. New York, 445 U.S. 573, 586 (1980)

---

457 U.S. 800, 818 (1982)).

[8]  Defendants note that Simonetti did not enter Zygmunt's home to make any arrest, conduct any search or investigation, or to make any seizure.  Even so, if plaintiffs proved warrantless unauthorized entry, a Fourth Amendment violation would be established.  See e.g., Coon v. Town of Springfield, 404 F.3d 683, 686 (2d Cir. 2005) (unauthorized warrantless entry into plaintiff's home to deposit eviction papers, if proved, would constitute a violation of plaintiff's Fourth Amendment rights).

and Steagald v. United States, 451 U.S. 204, 216 (1981)).
Simonetti claims no exigent circumstances exception.  In
determining whether there are genuine issues of material fact
about whether plaintiff's consent was voluntary, consideration is
given to "the totality of the circumstances to determine whether
the consent was a product of that individual's free and
unconstrained choice, rather than mere acquiescence in a show of
authority."  United States v. Garcia, 56 F.3d 418, 422 (2d Cir.
1995) (internal quotations and citations omitted).  The standard
for measuring whether plaintiff consented is one of "objective
reasonableness" and the "ultimate question presented" "is whether
the officer had a reasonable basis for believing that there had
been consent."  Id. at 423 (internal citations omitted).
Knowledge of the right to refuse to consent to entry is not
required to find voluntariness so long as consent is not coerced.
See id. at 422.

     In the absence of any evidence of coercion or threat of
force, and given the admission that Zygmunt agreed Simonetti
could enter, the gist of Zygmunt's claim is that she was coerced
into consenting by Simonetti's trickery in the middle of the
night when she was ill.  Zygmunt admits that she "told
[Simonetti] he could come over," see Pl's L.R. 56(a)(2) Stmt. Ex.
1 (Zygmunt deposition) at 17, and that when he arrived, she
opened the door and "let him into [her] home," id. at 20.

13

Zygmunt "knew [she] was alone in [her] house with a man with a gun, and [she] knew [she] [was] not supposed to resist." <u>See</u> Pl's L.R. 56(a)(2) Stmt. Ex. 1 (Zygmunt deposition) at 28. Zygmunt also admits, however, that even after she consented to Simonetti's entry, and she was in the process of signing the documents "[h]e was just being like really nice," and "he wasn't twisting [her] arm." <u>Id</u>. at 19, 28.

Viewing in the light most favorable to plaintiffs the inferences which could be drawn from this evidence of the totality of the circumstances, a genuine issue of material fact about the voluntariness of Zygmunt's consent to Simonetti's entry is not presented.[9]  Zygmunt testified that she had these thoughts while she was signing the documents, but after she had consented to Simonetti's entry, and as well, her testimony about defendant's post-entry conduct provides no evidence of coercion, threat, or intimidation to support an inference of any earlier coerced consent.  Assertions or manifestations of authority

_____

[9] Plaintiffs do not cite, and the Court's research has not found, any authority for the proposition that misrepresentations or confusion concerning the purpose of the entry renders consent to entry involuntary.  To the contrary, in <u>United States v. Jelks</u>, 273 F. Supp. 2d 280, 291-92 (W.D.N.Y. 2003), <u>aff'd</u>, 73 Fed. Appx. 486 (2d Cir. 2003), a parole officer's inaccurate statement to defendant's daughter that parole officers could conduct a search of their home "any time [the officers] felt there was a need to do so" was not coercive and thus had no impact on the court's determination that the daughter's consent to entry was voluntary under the circumstances.

(Simonetti was a police officer and had a gun) are insufficient
to establish coercion.  See Schwimmer v. Kaladjian, 988 F. Supp.
631, 643 (S.D.N.Y. 1997) (claim that plaintiff consented to entry
only in response to caseworker's assertion of authority as a
Child Welfare Administration employee did not establish
coercion), aff'd 164 F.3d 619 (2d Cir. 1998).  Absent any
evidence that defendant's conduct caused the consent to be
involuntary, the "reasonableness" of defendant's late night
conduct to remedy his own missteps is not at issue since all
warrantless entries are illegal absent consent or exigent
circumstances.  The evidence proffered as to plaintiff's
condition when she consented to defendant's entry does not
provide a basis for a reasonable juror to find that her consent
was involuntary and therefore Simonetti's entry cannot be proved
to have violated the Fourth Amendment.  Defendants' Motion for
Summary Judgment on plaintiffs' claim of unreasonable entry
against Officer Simonetti is thus granted.

**B.   Claim of False Arrest/Malicious Prosecution (Count III)**

Plaintiffs' claim of false arrest and malicious prosecution
alleges that Officer Cabral knew at the time he arrested Stone on
October 20, 2002 that he lacked probable cause to arrest because
he knew that his witnesses were lying and that his actions in
arresting Stone were intentional and inspired by malice.
See Amended Complaint, Count Three, at ¶¶ 5-6.  Defendants argue

that the claim either should be dismissed because Stone's arrest was supported by probable cause, or should be barred by qualified immunity.

Plaintiffs' evidence of lack of probable cause is that McCarthy told Stone that Barta and Connaughton told Cabral that the perpetrator (Stone) had left in his black Jeep, but Cabral knew the Jeep had not been operated recently, that Stone was driving a white car when stopped, that Stone's hands were clean and he was not sweaty or breathing heavily, and that plaintiff gave Cabral an alibi and timecard.  Plaintiffs also claim that Cabral improperly failed to take the written statement of eye-witness Justin McCarthy or the passenger in Stone's car, Lee Bates, or investigate plaintiff's college campus alibi.  At oral argument, plaintiff augmented his argument to include the claim that Cabral's knowledge of prior history between Barta and Stone demonstrates that Cabral knew Barta had a motive to lie, and that the disappearance of the college parking timecard should be held against defendant who was charged with its care.  Based on this version of the facts, plaintiffs claim that a reasonable jury could find it was not objectively reasonable for Cabral to believe that he had probable cause to arrest Stone.

Claims for false arrest and malicious prosecution under Section 1983 are governed by state law.  See Grimm v. Krupinsky, No. 04-2913-CV, 2005 WL 1586978 (2d Cir. July 7, 2005) (citing

Davis v. Rodriquez, 364 F.3d 424, 433 (2d Cir. 2004)).  Under
Connecticut law, an absence of probable cause is an essential
element of both claims.  See id. (citing Davis, 364 F.3d at 433,
and McHale v. W.B.S. Corp., 187 Conn. 444, 447 (Conn. 1982)).
"Probable cause to arrest exists when the arresting officer has
knowledge or reasonably trustworthy information of facts and
circumstances that are sufficient to warrant a person of
reasonable caution in the belief that the person to be arrested
has committed or is committing a crime." Esclara v. Lunn, 361
F.3d 737, 743 (2d Cir. 2004) (internal quotation and citation
omitted).  An officer is not required to investigate every
plausible claim of innocence before making an arrest.
See Caldarola v. Calabrese, 298 F.3d 156, 167 (2d Cir. 2002).
Even if actual probable cause is not found to have existed, an
arresting officer will be entitled to qualified immunity if there
was "arguable probable cause" for the arrest.  Id.  The Second
Circuit has defined "arguable probable cause" as follows:

> Arguable probable cause exists if either (a) it was
> objectively reasonable for the officer to believe that
> probable cause existed, or (b) officers of reasonable
> competence could disagree on whether the probable cause
> test was met.

Id.

Defendants maintain that the undisputed facts show probable
cause to arrest Stone for vandalism: (1) Cabral was told by Barta
and Connaughton that Barta's vehicle had been vandalized; (2)

both Barta and Connaughton orally and in sworn written statements identified Stone as the perpetrator ; (3) Cabral personally observed the damage to the vehicle; and (4) shortly after reporting to the scene and speaking to the eyewitnesses, Cabral observed Stone driving past the McCarthy residence, knowing he lived nearby.  Plaintiffs dispute that Cabral's reliance on the statements of Barta and Connaughton could support probable cause since they had given him information about the getaway car which was contradicted by his own observations about plaintiff's black Jeep and the white car plaintiff was driving when stopped, because Stone gave Cabral a timecard to document his alibi, and because Cabral inadequately investigated before arresting Stone.

"'The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction.'"  See Cohen v. Dubuc, No. 99cv2566 (EBB), 2000 WL 1838351, at *4 (D. Conn. Nov. 28, 2000) (citing United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983)).  The fact that Stone was later acquitted does not require the conclusion that probable cause was lacking for his arrest.  See id. (citing Krause v. Bennett, 887 F.2d 362, 371 (2d Cir. 1989)).  It is well established that when information "sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested" is received from a putative victim or eyewitness, probable cause exists absent

18

circumstances that raise doubts as to the individual's veracity. See Curley v. Suffern, 268 F.3d 65, 70 (2d Cir. 2001); Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000); Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995); see also Illinois v. Gates, 462 U.S. 213, 233-34 (1983) ("[I]f an unquestionably honest citizen comes forward with a report of criminal activity – which if fabricated would subject him to criminal liability – we have found rigorous scrutiny of the basis of his knowledge unnecessary."). Indeed, "probable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994).

In this case, Officer Cabral claims reliance on the oral accusations and sworn written statements of two eyewitnesses (Barta and Connaughton), his own observations of the damage to Barta's car, and Stone's presence in the immediate vicinity shortly after the crime was reported. It is not disputed that Barta and Connaughton, both eyewitnesses, identified Stone as the perpetrator and "it is well established that a law enforcement officer has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." Miloslavsky v. AES Eng'g Society, Inc., 808 F. Supp.

351, 355 (S.D.N.Y. 1992) (citing <u>Adams v. Williams</u>, 407 U.S. 143, 146-47 (1972)), <u>aff'd</u> 993 F.2d 1534 (2d Cir. 1993).  Furthermore, "[t]he veracity of citizen [complainants] who are the victims of the very crime they report to the police is assumed."  <u>Id</u>. Barta's statement that earlier that day Stone had been spreading rumors that Barta had been tested for the HIV virus and tested positive was some additional corroboration for Cabral that Barta's identification was believable, given the "HIV" "AIDS" words written in the frost on Barta's damaged car.

While plaintiff focuses on reasons why it would not be reasonable for Cabral to believe Barta and Connaughton were telling the truth, his proffered evidence is primarily inadmissible hearsay of what McCarthy told him Barta and Connaughton told Cabral initially, before Cabral informed them that plaintiff's Jeep was cold.  Absent evidence that this would be McCarthy's testimony, such inadmissible statements may not be used to meet plaintiff's burden under Rule 56.  <u>See</u> <u>Burlington Coat Factory Warehouse Corp. v. Esprit de Corp</u>, 769 F.2d 919, 924 (2d Cir. 1985); <u>accord</u> <u>Brink v. Union Carbide Corp.</u>, 210 F.3d 354, 2000 WL 426166, at *2 (2d Cir. 2000) (unpublished) ("[T]he evidence proffered by the party opposing summary judgment must be of a type that would be admissible at trial.").  As the record stands, the eyewitnesses (and victim) identified Stone as the perpetrator of the damage Cabral observed to exist.

20

Notwithstanding the disputes about plaintiff's sweatiness,
whether the perpetrator was seen getting into a distant dark car,
whether more extensive investigation might have yielded contrary
statements, or whether Barta's ill will towards Stone motivated a
false or mistaken identification, Cabral was entitled to rely on
the probable cause supported by the statements of Barta and
Connaughton.

As a general rule, in assessing whether a police officer had
probable cause to make an arrest, courts "consider only
information [the officer] relied on in concluding there was
probable cause" and whether it was reasonable, based on that
information, for the officer to conclude that probable cause
existed.  See Caldarola, 298 F.3d at 167-68.  An officer is "'not
required to explore and eliminate every theoretically plausible
claim of innocence before making an arrest.'" Id. (citing
Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir.
1997)),[10] and plaintiffs' arguments directed to Cabral's failure

_____

[10] See also Baker v. McCollan, 443 U.S. 137, 145-46 (1979)
("[W]e do not think a sheriff executing an arrest warrant is
required by the Constitution to investigate independently every
claim of innocence, whether the claim is based on mistaken
identity or a defense such as lack of requisite intent."); Krause
v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989) (concluding that
defendant was entitled to immunity from plaintiff's Section 1983
claim, stating "[i]t would be unreasonable and impractical to
require that every innocent explanation for activity that
suggests criminal behavior be proved wrong, or even contradicted,
before an arrest warrant could be issued with impunity. . . .
Once officers possess facts sufficient to establish probable
cause, they are neither required nor allowed to sit as

to further investigation are ineffective to resist summary
judgment.[11]  While Officer Cabral was obligated to conduct a
reasonable investigation, once he had a reasonable basis for
concluding there was probable cause to arrest, he did not need to
conduct further inquiries or take the statements of additional
witnesses.[12]  See Ricciuti, 124 F.3d at 128 (rejecting
plaintiff's arguments that once plaintiff protested his
innocence, officer should have conducted further investigation
and interviewed witnesses at the scene, where putative victim's
account of events was plausible and credible); Curley, 268 F.3d
at 69-70 (probable cause existed notwithstanding officer's
failure to conduct a more thorough investigation in light of
conflicting accounts from plaintiff and two witnesses).[13]  Thus,

---

prosecutor, judge or jury.  Their function is to apprehend those
suspected of wrongdoing, and not to finally determine guilt
through a weighing of the evidence.").

   [11]  Officer Cabral testified and plaintiffs have not disputed
that the timecard given to him by Stone listed a time of either 7
a.m. or 7 p.m., and the vandalism occurred after 2 a.m.  See Pl's
L.R. 56(a)(2) Stmt., Ex. 3 (Cabral deposition) at 45-46, 48-50.

   [12] Cabral determined from speaking with McCarthy at the scene
that of the three eye-witnesses, he had seen the least.  See Pl's
L.R. 56(a)(2) Stmt., Ex. 3 (Cabral deposition) at 32, 41.  Cabral
believed that Lee Bates, the passenger in Stone's car, would have
given a biased statement.  See id. at 43-45.  Officers are
entitled, and are often required, to make such credibility
determinations at the scene of a crime.  See, e.g., Curley, 268
F.3d at 70.

   [13] While there are cases in other circuits which suggest that
officers must "reasonably interview witnesses readily available
at the scene," in those cases the officer in question had failed

Officer Cabral had probable cause to arrest Stone based on the presumed credibility of Barta's and Connaughton's statements and his own corroborative observations, notwithstanding his failure to investigate Stone's alibi and to obtain written statements from Justin McCarthy or Lee Bates.[14]   In the absence of evidence showing any genuine issue of material fact as to the existence of probable cause or "arguable probable cause" to arrest Stone, defendants' Motion for Summary Judgment on the false arrest/malicious prosecution count will be granted.

## IV.   CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment [Doc. # 36] is granted.   The claim remaining for trial

---

to even confirm that a crime had actually been committed by neglecting to interview eyewitnesses.   See, e.g., Romero v. Fay, 45 F.3d 1472, 1476-77 & n.2 (10th Cir. 1995) (citing cases). Thus these cases do not indicate that Officer Cabral was obligated to take the sworn statements of McCarthy or Bates before arresting Stone.   See Forest v. Pawtucket Police Dep't, 377 F.3d 52, 57 (1st Cir. 2004) (where alleged sexual assault took place in front of multiple students and a teaching aide, and the officers failed to interview any such eyewitnesses, officers' probable cause determination was still reasonable and supported by a sufficiently thorough investigation where they interviewed the victim twice, spoke with the victim's mother to verify the victim's account, and confirmed the events with the school principal).

[14]   In considering Cabral's reliance on the sworn statements of Barta and Connaughton in making his probable cause determination, the Court bears in mind that "[t]he actual accuracy or veracity of [the] statement is irrelevant to a determination of whether [defendant] has arguable probable cause. Rather, the question is whether [defendant] could have reasonably relied on it."   Escalara, 361 F.3d at 745.

is the claim of unreasonable force against Officer Koskinas
(Count II).  The parties' Joint Trial Memorandum shall be filed
within 30 days of the date of this ruling.


                         IT IS SO ORDERED.

                         _____/s/_____
                         Janet Bond Arterton
                         United States District Judge

**Dated at New Haven, Connecticut this 13th day of January, 2006.**