UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Lucas B. Stone, et al.,          :
    Plaintiffs,               :
                              :   Case No. 3:04cv18 (JBA)
v.                               :
                              :
Town of Westport, et al.,        :
    Defendants.               :

RULING ON MOTION TO RECUSE [DOC. # 95], MOTION TO AVER FRAUD
[DOC. # 99], MOTION TO EXTEND DEADLINE FOR DISCOVERY [DOC. # 102]

Summary judgment proceedings having been concluded,
reconsideration thereon having been denied, multiple status
conferences having been held before the Court, and trial having
been scheduled, plaintiffs Lucas B. Stone and Joan Lorraine
Zygmunt[1] now move (1) that the undersigned recuse herself from
presiding over this case, Mot. to Recuse [Doc. # 95]; (2) to aver
fraud, Mot. to Aver Fraud [Doc. # 99]; and (3) to extend the
deadline for discovery, Mot. for Discovery [Doc. # 102].
Defendants oppose all three motions.  For the reasons that
follow, plaintiffs' Motions to Recuse and to Aver Fraud will be
denied; plaintiffs' Motion for Discovery will be granted.

I.   Motion to Recuse [Doc. # 95]

Plaintiffs move to recuse the undersigned from this case,
claiming violation of "the law and the Code of Conduct for United

---

[1] Pursuant to the Court's Ruling on Defendants' Motion for
Partial Summary Judgment [Doc. # 55] and Ruling on Plaintiffs'
Motion for Reconsideration [Doc. # 91], all claims asserted by
plaintiff Zygmunt have been dismissed.

1

States Judges," as well as "bias," denial of their "rights under law," and incompetence.  Mot. to Recuse at 1.  Plaintiffs refer to Canon 3 of the Code of Conduct for United States Judges concerning "adjudicative responsibilities," "administrative responsibilities," and "disqualification."[2]

While plaintiffs accurately quote these provisions from the standards governing conduct of United States judges, it is 28 U.S.C. § 144 and § 455 which set out the bases for judicial disqualification.  The section applicable to this motion, 28 U.S.C. § 455(a), states: "Any justice, judge or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[3]

---

[2] Plaintiffs also refer to Conn. L. Civ. R. 83.2 concerning attorney professional conduct standards and Grievance Committee procedures.

[3] The Court construes plaintiffs' Motion to Recuse as one pursuant to § 455 because plaintiffs have not filed an affidavit as required in a request for recusal brought pursuant to 28 U.S.C. § 144, which states "[w]henever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding," and thus § 144 does not appear applicable to plaintiffs' claims. Further, it is Section 455(a) that is applicable to plaintiffs' motion, and not Section 455(b)(1), which is more subjective and refers to an actual personal bias, prejudice, or personal knowledge held by the judge.  "A determination of bias under this section must be based on extrajudicial conduct, not conduct arising in a trial setting."  In re Drexel Burnham Lambert, Inc., 861 F.2d at 1314; accord Apple, 829 F.2d at 333 (recusal analysis "looks to extrajudicial conduct as the basis for making such a determination, not conduct which arises in a judicial context").

Once a recusal motion is brought,[4] the decision whether to grant
the motion is a matter within the sound discretion of the
district court as "[t]he judge presiding over a case is in the
best position to appreciate the implications of those matters
alleged in a recusal motion."  In re Drexel Burnham Lambert Inc.,
861 F.2d 1307, 1312 (2d Cir. 1988).  "In deciding whether to
recuse him [or her] self, the trial judge must carefully weigh
the policy of promoting public confidence in the judiciary
against the possibility that those questioning his [or her]
impartiality might be seeking to avoid the adverse consequences

---

All of the conduct alleged in plaintiffs' motion relates to
actions taken in the trial setting, and thus § 455(b) is
inapplicable here.

    [4] Although § 455 does not contain an explicit requirement of
timeliness, such a requirement "has been read into this section."
Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d 326, 333 (2d Cir.
1987).  "[A] party must raise its claim of a district court's
disqualification at the earliest possible moment after obtaining
knowledge of facts demonstrating the basis for such a claim."
Id.  In considering whether a motion to recuse is timely, "[a]
number of factors must be examined, including whether: (1) the
movant has participated in a substantial manner in trial or pre-
trial proceedings . . . ; (2) granting the motion would represent
a waste of judicial resources . . . ; (3) the motion was made
after the entry of judgment . . . ; and (4) the movant can
demonstrate good cause for delay."  Id. at 334.  Although
plaintiffs' motion is raised after the close of discovery and the
Court's ruling on defendants' summary judgment motion dismissing
some of plaintiffs' claims and also following the Court's
scheduling of this case for trial on the remaining claims, the
Court assumes without deciding, in order to facilitate
consideration of the merits of plaintiffs' motion, that
plaintiffs' motion is timely, particularly in light of the
withdrawal of plaintiffs' counsel in May 2006 and the Court's
ruling on plaintiffs' reconsideration motion shortly before the
filing of plaintiffs' recusal motion.

of him [or her] presiding over their case. . . . Litigants are entitled to an unbiased judge; not to a judge of their choosing." Id. "Recusal motions should not be used as strategic devices to judge shop . . . and [thus] there is a substantial burden on the moving party to show that the judge is not impartial." McCann v. Commc'ns Design Corp., 775 F. Supp. 1506, 1522 (D. Conn. 1991) (internal quotations omitted). "It is vital to the integrity of the system of justice that a judge not recuse him [or her] self on unsupported, irrational or highly tenuous speculation," id. at 1523, and accordingly, "[a] judge is as much obliged not to recuse him [or her] self when it is not called for as [s]he is obliged to when it is." In re Drexel Burnham Lambert Inc., 861 F.2d at 1312.

Section 455(a) "establishes an objective standard designed to promote public confidence in the impartiality of the judicial process." Id. at 1313. "The substantive standard for determining recusal pursuant to section 455(a) is whether a reasonable person, knowing and understanding all the relevant facts, would conclude that the judge's impartiality might reasonably be questioned." McCann, 775 F. Supp. at 1523.

June 2005 Correspondence

Plaintiffs' first argument relates to an exchange of letters between plaintiff Zygmunt and the Court in June 2005. Plaintiffs are correct that pursuant to D. Conn. L. Civ. R. 83.2(c)(3), a

4

judge has the authority at her discretion to refer an attorney disciplinary matter to the Grievance Committee ("[w]hen any misconduct or allegation of misconduct which would warrant discipline of any attorney admitted to practice before this Court comes to the attention of any Judge of this Court, the Judge <u>may</u> refer the matter to the Grievance Committee for the initiation of a presentment or the formulation of such other recommendation as may be appropriate") (emphasis added).  Given their status as represented parties and their statement that they were awaiting their counsel's response to their written complaints, referral to their counsel, in the event there had been any miscommunication, seemed the most appropriate course, along with providing plaintiffs with a copy of the case docket sheet.

Plaintiffs' complaints that the Court did not advise them of their right to file a complaint with the Grievance Committee, thus allegedly denying them their "right to be heard on [their] complaints," does not justify recusal.  Rule 83.2(c) does not require a judge of this District to refer all potential misconduct to the Grievance Committee, leaving such referrals to a judge's discretion exercised on a case-by-case basis.  Nor do courts hear grievances about attorney conduct until a presentment is made by the Grievance Committee.  "The business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned

behavior taints the trial of the cause before it." <u>W.T. Grant
Co. v. Haines</u>, 531 F.2d 671, 677 (2d Cir. 1976); <u>see</u> <u>also</u> <u>United
States Football League v. Nat'l Football League</u>, 605 F. Supp.
1448, 1463 n.31 (S.D.N.Y. 1985) (stating, in context of a
disqualification motion, "[w]hile the [Code of Professional
Responsibility] is a source by which courts may be guided, it is
not the final word on disqualification.  Courts are not policemen
of the legal profession; that is for the disciplinary arm of the
bar.  Disqualification is granted to protect the integrity of the
proceedings, not to monitor the ethics of attorneys' conduct").[5]
Thus, plaintiffs' repeated claim that the Court "did not hold
[their] former counsel accountable to provide [them] with fair,
honest and competent representation," <u>see</u>, <u>e.g.</u>, Mot. to Recuse
at 7, is not a basis for recusal because it is not the role of
the Court, nor does the Court have the capacity, to police the

---

[5] With respect to plaintiffs' view that "Judge Arterton gave
us no option but to continue with our incompetent, dishonest and
uncommunicative counsel" (<u>see</u> Pl. Mot. at 5), the Court expressly
gave no direction to plaintiffs, who remained free to discharge
their counsel based on their dissatisfaction with his
representation of them.  However, as detailed below, until
termination and withdrawal of an attorney from representation, a
party is held to the legal judgments and decisions made by its
counsel.  <u>See</u> <u>Link v. Wabash R.R. Co.</u>, 370 U.S. 626, 633-34
(1962) (where party chooses an attorney as his or her
representative in a litigation, the party cannot subsequently
"avoid the consequences of the acts or omissions of this freely
selected agent" as "[a]ny other notion would be wholly
inconsistent with our system of representative litigation, in
which each party is deemed bound by the acts of his lawyer-agent
and is considered to have notice of all facts, notice of which
can be charged upon the attorney").

attorney-client relationship unless ethical breaches by counsel will adversely affect the integrity of the trial process. Investigating counsel's adherence to the Rules of Professional Conduct is a function of the Grievance Committee, see United States Football League, supra.

As to plaintiffs' concerns about the information they did not receive as a result of Attorney Pattis' alleged misconduct (i.e. information about scheduled settlement conferences, status reports, and other documents filed with the Court), plaintiffs have access to, and apparently have availed themselves of such access to, the entire public file of this case maintained by the Office of the Clerk.  Notwithstanding plaintiffs' complaints about cancellation by Attorney Pattis of a scheduled March 2005 settlement conference for reasons which remain unknown to the Court, of which plaintiffs were apparently not informed, at the Court's July 10, 2006 status conference defense counsel expressed willingness on the part of defendants to engage in the subsequently scheduled pre-settlement conference held by Magistrate Judge Margolis on September 21, 2006, in which both plaintiffs and defense counsel participated telephonically. Although plaintiffs claim that the Court "did not hold Mr. Pattis responsible for cancelling the settlement conference just one day prior and violated Canon 3A(5) in failing to 'eliminate dilatory practices, avoidable delays and unnecessary costs,' and not

seeking 'to facilitate settlement,'" defendants did not seek
sanctions for any alleged dilatory conduct attributed to Attorney
Pattis' cancellation of the settlement conference, nor did
Magistrate Judge Margolis before whom the conference was to have
been held.  Further, this cancellation apparently has not
negatively affected defendants' willingness to engage in future
settlement discussions with plaintiffs.  In any event, plaintiff
Zygmunt's June 17, 2005 letter to the Court makes no specific
reference to Pattis' late cancellation of this March 2005
conference.

     Thus, the Court's response to plaintiff Zygmunt's letter and
failure to sanction Attorney Pattis for late cancellation of the
March 2005 settlement conference cannot be deemed indicative of
any judicial partiality or bias justifying recusal.

          Pro Bono Representation

     Plaintiffs also advance arguments regarding the Court's
comments made with respect to plaintiffs' pro se representation
at trial, their ability to obtain successor counsel to Attorney
Pattis, and the Court's denial of plaintiffs' request for pro
bono appointment.

     Plaintiffs dispute defendants' statement that plaintiffs
"requested pro bono counsel," contending instead "[w]e did not.
We requested pro bono assistance with our pro se representation."
Pl. Reply [Doc. # 98] at 2.  The Court denied plaintiff Zygmunt's

motion for pro <u>bono</u> counsel because all her claims had been
dismissed, and denied plaintiff Stone's motion because he had
given no demonstration that he had tried but was unable to obtain
counsel.  <u>See</u> Ruling on Mot. to Withdraw Appearance and Mot.
Requesting Pro Bono Assistance with Pro Se Representation [Doc. #
73].  Further, plaintiffs' claim that they "have a constitutional
right to <u>pro</u> <u>bono</u> representation" is misplaced as there is no
constitutional right to <u>pro</u> <u>bono</u> representation in a civil case.
While 28 U.S.C. § 1915(e) provides authority to the Court to
appoint <u>pro</u> <u>bono</u> counsel "to represent any person unable to
afford counsel," as detailed in the Court's ruling declining to
appoint <u>pro</u> <u>bono</u> counsel, the Second Circuit has cautioned
against the routine appointment of counsel and has set out
certain requirements which must be met before appointment is
proper, which were not satisfied by plaintiffs in this case.

   Additionally, plaintiffs ground their recusal motion on
their characterization of comments the undersigned made at status
conferences concerning plaintiff Stone's <u>pro</u> <u>se</u> representation
and/or plaintiffs' ability to retain successor counsel.  The
plaintiffs misconstrue the Court's comments as a reprimand or
reproach for filing their grievance against Attorney Pattis,
which they see as indicative of bias.  In explaining the reality
of potential difficulties plaintiffs were likely to face in their
efforts to secure successor counsel – the prerequisite to filing

9

a renewed motion for appointment of counsel – the Court stated "I will alert you to a problem that you are going to have to deal with when you are talking with other lawyers, and that is they're going to ask what happened to your first lawyer, and you are going to tell them that you filed a grievance against him and he moved to withdraw based on an irreconcilable conflict arising out of that grievance . . . And that's going to be of concern to lawyers, that if they come in to represent you they would be concerned that you would grieve them, too.  So I'm just alerting you to think through that and be prepared to discuss it candidly and openly with them."  Similarly, in reflection of Stone's absence of legal education, the Court observed "I think it will be hard for you to represent yourself," explaining to him at the September 5, 2006 status conference how his <u>pro se</u> representation would be handled at trial, particularly with respect to the presentation of his own testimony.

Thus, plaintiffs' complaints about the Court's denial of their request for a <u>pro bono</u> counsel appointment and the Court's observations related to retaining new counsel and <u>pro se</u> representation do not form a basis for recusal.

<u>Adverse Rulings</u>

Lastly, plaintiffs argue for recusal stating "Judge Arterton ruled against or ignored all of the points we raised in our motion for [re]consideration," including reference to the Court's

10

denial of their motion to disqualify defense counsel.  <u>See</u> Pl. Mot. at 4, 7.  It has long been held that "[t]he recusal statute was never intended to enable a litigant to oust a judge for adverse rulings made, for such rulings are reviewable otherwise." <u>In re Int'l Bus. Machines Corp.</u>, 618 F.2d 923, 929 (2d Cir. 1980) (citing <u>American Steel Barrel Co.</u>, 230 U.S. 35, 44 (1913)).  The fact that the Court has issued decisions adverse to plaintiffs in and of itself suggests no partiality, bias, or hostility.  Errors in those rulings may be addressed on appeal.

The substance of plaintiffs' complaints relate primarily to the Court's assessment of Officer Cabral's criminal trial testimony on reconsideration of the Summary Judgment Ruling and to the Court's Ruling on Plaintiffs' Motion to Disqualify Defense Counsel.  Plaintiffs point to Attorney Pattis' statement at oral argument on defendants' summary judgment motion that he would offer Cabral's prior testimony at trial, but had not included its text in his opposition to defendants' summary judgment motion: "Judge Arterton did not interpret the law to him and tell him he had to submit any evidence admissible at trial at the time of opposition to summary judgment under Amended Rule 56.  We raised this issue in our motion for reconsideration, but Judge Arterton did not deal with it in her ruling."  Mot. to Recuse at 5. Counsel is charged with knowing the federal rules and associated case law.  As discussed, <u>supra</u>, plaintiffs are bound by their

11

_

counsel's decisions and any complaint plaintiffs have against
Attorney Pattis, including failure to include Cabral's trial
testimony in the summary judgment record, is appropriately raised
in the Grievance Committee proceeding initiated by plaintiffs
that is underway and/or in a civil professional malpractice
action for damages.  See generally Rubens v. Mason, 387 F.3d 183,
190 (2d Cir. 2004) ("The malpractice judge or jury must decide a
'case within a case' and determine what the result would have
been absent the alleged malpractice.").

     With respect to the merits of plaintiffs' reconsideration
motion and the referenced Cabral trial testimony, as detailed in
the Ruling on Defendants' Motion for Partial Summary Judgment
[Doc. # 55] and the Ruling on Plaintiffs' Motion for
Reconsideration [Doc. # 91], the record evidence, including the
testimony of Officer Cabral at Stone's criminal trial for
criminal mischief, establishes the existence of probable cause
for Stone's arrest and the basis for dismissal of Stone's false
arrest/malicious prosecution claim (Count III).  "'The quantum of
evidence required to establish probable cause to arrest need not
reach the level of evidence necessary to support a conviction,'"
see Cohen v. Dubuc, No. 99cv2566 (EBB), 2000 WL 1838351, at *4
(D. Conn. Nov. 28, 2000) (citing United States v. Fisher, 702
F.2d 372, 375 (2d Cir. 1983)), and "it is well established that a
law enforcement officer has probable cause to arrest if he

12

received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." Miloslavsky v. AES Eng'g Society, Inc., 808 F. Supp. 351, 355 (S.D.N.Y. 1992) (citing Adams v. Williams, 407 U.S. 143, 146-47 (1972)), aff'd 993 F.2d 1534 (2d Cir. 1993). Plaintiffs' arguments about the alleged contradictions between Officer Cabral's trial and deposition testimony do not alter the Court's conclusion.

Specifically, plaintiffs point to the following which they claim are inconsistencies undermining the Court's earlier determinations and which they contend the Court neglected to address: (1) that "[i]n Cabral's trial testimony he admits that the two witnesses at first said they saw Stone escape in his black Jeep, and when he went around the corner and felt [Stone's] black Jeep he knew that part of their statement was false," and that Cabral "omitted to put that information into his report;" (2) that "[i]n his deposition testimony [Cabral] says there was no identification of [the] vehicle and that he simply felt the black Jeep because it could have been any car in town;" (3) that "Cabral also stated in his incident report that he recognized the car (the white Subaru) from previous complaints, which is provably false information;" (4) that Cabral "also states in his deposition testimony that, in accordance with department guidelines, he had the two witnesses' sworn signed statements

13

before he arrested Stone, a statement belied by his trial testimony;" and (5) that "[d]uring the trial testimony the prosecutor makes the point that there is little damage shown to the bumper in the Polaroid shots taken by the police department, and in Cabral's deposition testimony he acknowledges that the photos didn't show the damage."  Mot. to Recuse at 5-6.

Taking plaintiffs' arguments in turn, while Officer Cabral acknowledged that the initial witness statements that the perpetrator departed in a black Jeep "turned out to be false," on the basis of Cabral's investigation of Stone's black Jeep which was cold and thus clearly had not been driven recently, Cabral also stated in his trial testimony that he relied on the witness statements "that they knew Mr. Stone for three years and were sure that it was Mr. Stone."  Cabral Trial Test. [Doc. # 87, Ex. 16] at 15.  And, as the Court noted in its reconsideration ruling, "the Court's [summary judgment] ruling included the fact that Cabral was initially told that Stone escaped in his black Jeep, but that Cabral later found that the Jeep hadn't been driven recently, and rejected plaintiffs' argument that Cabral's omission of this information from his report had legal significance."  See Reconsideration Ruling at 7 (citing Summary Judgment Ruling).  Next, as to Cabral's explanation of why he did not include the witnesses' reference to a dark getaway car in his incident report, Cabral's deposition and trial testimony are not

14

in conflict because at trial he acknowledged that the information about a getaway car was not included in his report and at deposition he explained that he chose not to include this information in his report because there had been no identification (make, type, license plate) of the car which would render the information worthy of inclusion.  See Cabral Dep. [Doc. # 47, Ex. 3] at 37, 108.  Next, while plaintiffs claim that Cabral's notation in his report that he recognized Stone's white station wagon from previous complaints is "provably false," plaintiffs have not submitted evidence to contradict Cabral's observation.  Moreover, Cabral also stated in his report that the victim/witnesses stated that Stone was in the white station wagon and that Cabral himself recognized Stone as the driver of the car.  See Police Report [Doc. # 87, Ex. 27].  As to plaintiffs' contentions regarding the timing of Stone's arrest vis-a-vis the sworn written statements from Barta and Connaughton, it is immaterial whether Cabral took the written statements before or after Stone's arrest, as his testimony was that he had received the substance of the statements in oral form prior to the arrest, prior to their departure from the scene of the crime.  Lastly, as to plaintiffs' claim about Cabral's trial testimony acknowledging a lack of damage to Barta's car, Cabral in fact testified that the bumper originally was "hanging," but that when he returned to the scene "with the Polaroid, it was taped up," so the photograph

is "not exactly how it looked when [Cabral] arrived."  Cabral
Trial Test. at 10-11.  Cabral also testified that while the
writing on the car is not apparent in the photograph, "H.I.V."
was "clearly" visible to him when he first arrived.  Id. at 11-
12.

In short, the claimed inconsistencies to which plaintiffs
refer are either not actual inconsistencies or are immaterial to
the Court's probable cause assessment inasmuch as the record,
even including Cabral's trial testimony which was later submitted
by plaintiffs, supports the conclusion that Officer Cabral had
probable cause to arrest Stone for the damage to Barta's car
because both Barta and Connaughton told him that they "were sure
that [the perpetrator] was Mr. Stone," which accusations were
corroborated by Cabral's observation of Stone very near the scene
of the crime shortly after the crime had been reported, his
observations of Stone's nervous and sweaty appearance, and the
fact that Stone's alibi was not supported by the timecard given
to Cabral.[6]  As to plaintiffs' complaints that the Court did not

---

[6] Contrary to plaintiffs' contentions, see Pl. Mot. at 6,
the Court did not opine the absurdity that running up a hill is a
crime, or suggest that Stone was charged with such a crime;
rather, the Court's rulings hold that the only inference the
record supports is that Cabral had probable cause to arrest
plaintiff, based on his own observations and the statements of
witnesses, including Cabral's testimony that "Mr. Barta had said
that, and Mr. McCarthy and Mr. Connaughton said they knew Luke
Stone had – they just saw him jump on the back of [Barta's] car .
. . and break off the back bumper of the vehicle and they believe
that he wrote HIV on the back window of the vehicle."  Cabral

refer the claimed perjury of Cabral to the FBI for investigation, for the reasons just detailed, no perjury is readily apparent from the trial and deposition testimony in the record.

With respect to plaintiff Zygmunt's claim of unreasonable entry, plaintiffs contend that "Judge Arterton persists in feeling entitled to interpret Zygmunt's state of mind" and argue that there were no exigent circumstances in this case justifying Officer Simonetti's warantless entry into Zygmunt's house.  <u>See</u> Mot. to Recuse at 7.  As noted in the Court's previous rulings, however, defendant Simonetti claimed no exigent circumstances exception, and in any event the record evidence, including Zygmunt's own deposition testimony, demonstrated that Zygmunt consented to Simonetti's entry.  <u>See</u> Zygmunt Dep. [Doc. # 47, Ex. 1] at 17, 19-20, 25 (Zygmunt told Simonetti that he could come over and when he arrived, she let him in).

With respect to the Court's Ruling on Plaintiffs' Motion to Disqualify Defense Counsel, plaintiffs' reiterate their argument that defense counsel's failure to disclose to plaintiffs that Attorney Christy Doyle had left Attorney Pattis' office to join their firm was "in violation of the Rules of Professional Conduct" and that the Court denied plaintiffs' motion "despite the opinion of the American Bar Association that this type of conflict of interest would be grounds for a mistrial and appeal."

Dep. at 32-33, 35-36; <u>accord</u> Cabral Trial Test. at 15.

Mot. to Recuse at 7.   However, as previously noted, although
courts' "decisions on disqualification motions often benefit from
guidance offered by the American Bar Association (ABA) and state
disciplinary rules . . . such rules merely provide general
guidance and not every violation of a disciplinary rule will
necessarily lead to disqualification." Hempstead Video, 409 F.3d
at 132; accord United States Football League, supra.   Even
considering the claimed conflict under the rules cited by
plaintiffs in their disqualification motion (Connecticut Rules of
Professional Conduct 1.9 and 1.10), the Court determined that
disqualification was not warranted because the affidavits of
Attorneys Doyle and Radshaw demonstrated that Attorney Doyle
never acquired any protected information about plaintiffs or this
case while at Attorney Pattis' firm and according to Rule 1.10(b)
Attorney Doyle must have "acquired information protected by Rules
1.6 and 1.9(2)," see Rule 1.10(b), in order for any
disqualification to be imputed to defense counsel.   Accord Rule
1.10(b), Cmt. on Confidentiality ("Subsections (b) and (c)
operate to disqualify the firm only when the lawyer involved has
actual knowledge of information protected by Rules 1.6 and
1.9(2)."); see also Faria v. Faria, No. 536038, 1997 WL 12149, at
*1-2 (Conn. Super. Ct. Jan. 3, 1997) (denying motion to
disqualify pursuant to Rule 1.10(b) where attorney who switched
law firms testified that "she ha[d] no recollection . . . of

18

anything in the <u>Faria</u> file and that she [did] not recall having any knowledge of it in the past," reasoning that "[t]he key words in Rule 1.10 are . . . 'and about whom the lawyer <u>had acquired</u> <u>information</u> protected by Rules 1.6 and 1.9(b)' . . .[and] the court finds that [Attorney] Horvitz does not now have any knowledge of the file and there is no evidence that she ever did acquire any confidential information which could be used to the disadvantage of the plaintiff").

The Court is mindful of the Second Circuit's observation that those questioning the impartiality of a judge may "be seeking to avoid the adverse consequences of him [or her] presiding over their case" and that "[l]itigants are entitled to an unbiased judge; not to a judge of their choosing." <u>In re</u> <u>Drexel Burnham Lambert Inc.</u>, 861 F.2d at 1312.  Here, the Court finds no grounds in plaintiffs' arguments concerning the substance of its rulings which could justify recusal.  The claimed errors alleged by plaintiffs can be taken up with the Second Circuit on appeal of this case once judgment has entered.

### Conclusion

None of the grounds cited by plaintiffs support an inference of partiality or bias justifying this Court's recusal from this case, particularly given the Second Circuit's caution that "[a] judge is as much obliged not to recuse him [or her] self when it is not called for as [s]he is obliged to when it is." <u>Id</u>.

19

Plaintiffs' Motion to Recuse will be denied.

## II.   **Motion to Aver Fraud [Doc. # 99]**

Plaintiffs also move to "aver fraud," claiming that their former counsel, Attorney Pattis, withdrew certain of their claims in this action without their consent, that Attorney Pattis in fact never informed defense counsel that the plaintiffs themselves had agreed to withdraw certain claims or that he was withdrawing the claims on their behalf, only that "he" was withdrawing the claims, and seeking restoration of the withdrawn claims to this action.

Although defendants argue the futility of the withdrawn claims, and plaintiffs discuss at length the facts they contend demonstrate the merits of their equal protection claim, see Pl. Reply [Doc. # 101] at 2-5, the arguments as to the merits of the withdrawn claims will not be addressed since there is no summary judgment record against which to assess the parties' positions. Plaintiffs simply will be held to Attorney Pattis' decision to voluntarily withdraw their claims.  An attorney and his or her client(s) stand in a "relationship of principal and agent, with the attorney being the agent of the client/principal, and acting with, at least, apparent authority."  Jenkins v. Gen. Motors Corp., 164 F.R.D. 318, 320 (N.D.N.Y.), aff'd 101 F.3d 1392 (2d Cir. 1996).  Accordingly, "[a] client is not generally excused from the consequences of his attorney's nonfeasance or

negligence."  <u>Sasso v. M. Fine Lumber Co.</u>, 144 F.R.D. 185, 189
(E.D.N.Y. 1992).  Relying on these principles, the Court in <u>Doe
v. Odili Techs., Inc.</u>, 95cv1957 (AHN), 1997 WL 317316, at *4 (D.
Conn. May 25, 1997), rejected a plaintiff's argument that the
withdrawal of her EEOC charges was ineffective because she had
not signed the filed withdrawal.  Indeed, where a party
voluntarily chooses an attorney as his or her representative in a
litigation, the party cannot subsequently "avoid the consequences
of the acts or omissions of this freely selected agent" as "[a]ny
other notion would be wholly inconsistent with our system of
representative litigation, in which each party is deemed bound by
the acts of his lawyer-agent and is considered to have notice of
all facts, notice of which can be charged upon the attorney."
<u>Link</u>, <u>supra</u>, 370 U.S. at 633-34.[7]

To the extent plaintiffs remain concerned that there are
status conferences or other reports to the Court of which they
are unaware, they have, as noted above, access to the full Court
file in the Clerk's office.  The Court has previously provided to
plaintiffs copies of the case docket sheet and plaintiffs

---

[7] This principle of representative litigation that a client
is held to his or her attorneys legal judgment to withdraw a
claim is thus distinct from the operative principle in the
context of settlement discussions that "the decision to settle a
case belongs to the client alone."  <u>See</u> <u>Johnson v. Schmitz</u>, 237
F. Supp. 2d 183, 189 (D. Conn. 2002) (citing <u>United States v.
Beebe</u>, 180 U.S. 343, 350-53 (1901); <u>United States v. Int'l Bhd.
of Teamsters</u>, 986 F.2d 15, 19 (2d Cir. 1993)).

indicate they have a transcript of the January 11, 2006 oral argument.  The docket for the period of time prior to plaintiffs' pro se appearance reflects an April 29, 2004 scheduling conference, a January 4, 2005 status conference, and a March 24, 2006 telephonic conference.  Plaintiffs have participated in two status conferences since then, at which the pretrial conference and jury selection dates were set.

### III. Motion to Extend Deadline for Discovery [Doc. # 102]

Lastly, plaintiffs move to extend the deadline for discovery on the basis that defendants have denied plaintiffs' requests for "certain documents and other materials" "on the grounds that it comes outside a discovery deadline of February 15, 2005."  Mot. for Discovery at 1.  Plaintiffs contend that they never received a copy of the case management plan nor discussed it with Attorney Pattis, never received copies of any scheduling orders, and had no knowledge of the discovery deadline.  Id.  The Court indicated at the July 10, 2006 status conference that it would consider allowing supplemental discovery in light of plaintiffs' May 2006 filing of their pro se appearances and withdrawal of plaintiffs' former counsel.  On the condition that the jury selection scheduled for February 28, 2007 and the trial scheduled to commence immediately thereafter will not be interfered with, the Court will reopen discovery for a very limited period with respect to plaintiff Stone's excessive force claim against

Officer Koskinas only, particularly in light of plaintiffs'
representation that they do not have all documentation exchanged
between defense counsel and Attorney Pattis.  Accordingly, the
parties will be referred to Magistrate Judge Joan Glazer Margolis
for a discovery conference.

## IV.  Conclusion

For the foregoing reasons, plaintiffs' Motion to Recuse
[Doc. # 95] and Motion to Aver Fraud [Doc. # 99] are DENIED.
Plaintiffs' Motion to Extend Deadline for Discovery [Doc. # 102]
is GRANTED, and a limited supplemental discovery period is
ordered.


                          IT IS SO ORDERED.

                          _____/s/_____
                          Janet Bond Arterton
                          United States District Judge

**Dated at New Haven, Connecticut this 12th day of January, 2007.**